**In the Matter of ERICH, a minor child.**

Court of Chancery of Delaware,
New Castle.

May 4, 1973.

Julius Komissaroff, Berg, Taylor & Komissaroff, Wilmington, for Roman and his wife.

Daniel M. Kristol, Killoran & Van Brunt, Wilmington, for Dr. and Mrs. H.

Thomas S. Lodge, Connolly, Bove & Lodge, Wilmington, for Gretchen and her husband.

Daniel L. Twer, Morris, James, Hitchens & Williams, Wilmington, for Martha and her husband.

DUFFY, Chancellor:

Dr. Karl S. and his wife Joanna died in an automobile accident in Jamaica on February 24, 1973. They were the parents of Erich, born May 31, 1972. Kristopher, age about 2 years and a brother to Erich, died from injuries received in the same accident. Neither Dr. S. nor his wife left written instructions as to the apppointment of a personal guardian for Erich.[1] Cross-petitions for such appointment have been filed by (a) Roman, the only brother of Dr. S. and his wife; (b) Gretchen, the

---

1. Without objection by any party Delaware Trust Company, Dr. S.'s executor and the trustee of an inter-vivos trust he created, has been appointed as guardian of Erich's property.

only sister of Mrs. S. and her husband; (c) Martha, Dr. S.'s first wife (who divorced him in 1963) and her husband; and by (d) Dr. H. and his wife with whom the child was placed on a temporary basis.[2] Chancery jurisdiction is statutory, 12 Del. C. § 3903. This is the decision after final hearing.

### A.

The parties are agreed that the Court should apply one standard in making the appointment: the best interest of the child. In re Two Minor Children, Del.Ch., 283 A.2d 859 (1971). Given the differences in relationships, nationality, culture, geography and other circumstances which are reflected in the competing petitions, the decision is one of unusual difficulty, particularly because of the child's age. Thus, if the petition of Martha and her husband is granted, the child will be raised in southern California in the home of two practicing physicians, who have two girls of their own (ages 4 and 2), with his half-sister, Sarah, age 14. If the petition of Gretchen and her husband is granted, the child will be raised in the home of a young couple now living in Texas who have a 4-year-old child of their own; the husband is still in school trying to complete work on a doctorate degree, the wife is employed as a secretary. And if the petition of Roman and his wife is granted, the child will live in Austria with a paternal uncle and his wife who have two girls, ages 8 and 10. And if the petition of Dr. H. and his wife is granted, the child will be raised in Delaware by a doctor and his wife, the parents of four children, none of whom is related to him.

As these facts show, petitioners and their living circumstances are quite different, but they are much alike in two significant respects: the evidence of each shows a sincere interest and concern for Erich and, importantly, the evidence also shows that each is qualified for appointment as guardian. I so find as fact. The critical question, therefore, is who among four qualified applicants should be appointed in the best interest of the child? In deciding this question the Court has had the assistance of social reports (prepared by an official agency in the home community of each petitioner, respectively) as well as the trial evidence and arguments of counsel. While the social reports are necessarily limited, they tend to confirm and supplement the testimonial evidence.

### B.

█ I consider, first, the petition of Dr. and Mrs. H. In terms of professional association, geographic location and contemporary social circumstances, these petitioners are in the best position to continue the child in the kind of environment which his natural parents were providing at the time of their deaths. But two factors persuade me not to appoint them. The first is based on the testimony of Dr. H. who candidly, completely and helpfully described their interest in the child. The H.'s do not want to oppose the petition of any blood relative; indeed, their view, understandably, is that they will accept appointment only if each blood relative is determined not to be a suitable guardian. And the second factor is directly related to this: under general law the Court has a duty to prefer a blood relative to a stranger if all other factors are equal. 39 C.J.S., Guardian and Ward, § 18c. Compare 13 Del.C. § 701. Given the availability of blood relatives whom I deem to be qualified, I conclude that the Court should honor the request of Dr. and Mrs. H. and appoint someone else. I should also add that the entire record shows, abundantly, that Dr. and Mrs. H. have given generously of themselves in providing for the baby and the other members of the family in this time of distress.

---

2. A petition for appointment was also filed by Dr. W. and his wife but was withdrawn on the morning of trial.

## C.

I now turn to the application by Martha. She and her husband are petitioners and the Court would have been in a better position to make an overall evaluation if he had been present, but for good reasons he could not be. I am satisfied that Martha sincerely wants to assume a guardian's responsibility for the child but a strong contributing factor to her own view is that of her daughter, Sarah, age 15. Sarah was both a half-sister to Kristopher and his godmother. And she is, of course, a half-sister to Erich.

The evidence showed a continuing and meaningful relationship between Dr. S. and Sarah and a strong attachment by her to Erich. No matter what the future of either child, the adults must give them full opportunity to strengthen the bond by continuing communications and visitations. But the fact is that the Court is being asked to appoint Martha and her husband, not Sarah, and it is their qualifications which I must evaluate. And as to Sarah, it is not unreasonable to anticipate that within seven or eight years she will be living independent of her mother and step-father. And at that time Erich will be only eight or nine years of age with a long period still remaining before he too is emancipated. In addition, the reality is that both Martha and her husband are fully committed professionals who, understandably, want to continue in the medical careers for which they are trained. The evidence shows that they are able to do this under present living circumstances, but adding a baby of the age of Erich to the household might well unsettle the fine balance which now prevails. And even if it were practical to risk this, the fact also is that for many hours each week the baby would be cared for by a housekeeper of whom the Court heard much but who did not testify (for good reasons). In sum, given all of this, I am not persuaded that the Court should pass over blood relatives and appoint Martha and her husband.

My analysis thus narrows the question to Gretchen and her huband and to Roman and his wife.

## D.

I first consider Gretchen and her husband. The evidence shows them to be a young couple, age 26, in a transitional stage in their personal and marital life. They now live in Austin, Texas. The husband is nearing the end of five years of graduate school, expecting to be awarded a master's degree this summer, hoping for a doctorate at sometime in the future, working as a part-time motel clerk, and searching for a teaching or research job in the northeastern part of the United States. Gretchen is employed on a fulltime basis as a secretary. Their child attends a form of pre-school on a fulltime basis. If necessary, the family will support itself from a $30,000 or $35,000 inheritance which the husband expects to receive this year.

The evidence shows that their one 4-year-old child is provided for but, given all attendant circumstances, the introduction of an eleven-month-old baby in this home would create serious economic and social pressures. Both parents testified that they do not plan a child of their own at this time. Both testified that they want the guardianship and I believe they do. But I am equally certain that a compelling reason why they have filed the petition and why they seek appointment is found in the person of Gretchen's father. Unquestionably he has a strong attachment to the child. But he testified quite candidly that he would not maintain an attachment to him if he were placed in southern California or in Austria. In short, he wants Erich not for the child's sake but only on his own terms.

This petition was filed late and in itself that is not important; its significance is found in the apparent willingness of Gretchen and her husband to see guardianship awarded to Dr. H. and his wife at a

time when they knew little about that family. I sense that this petition is now strongly motivated by a sense of duty. While that is to be respected and admired, I am not satisfied that Erich's best interest will be served by granting it.

### E.

Finally, I turn to Roman and his wife. Both of them testified. Roman is 44 years of age, his wife is 33; they have. been married for 11 years. They live in a city of some 200,000 in Austria. The evidence carefully details Roman's income, the part thereof required to support his family, the circumstances under which they live and the way in which their two daughters are raised.

The pictures in evidence support the testimony and show that the family lives in pleasant facilities which are adequate for them and an additional baby. Roman's wife is a fulltime homemaker and mother who is able to and does devote her time exclusively to her home and family.

Through the Austrian Embassy in Washington, social reports have been received from an official government agency and they state in part:

"The Youth Office of the City . . . hereby confirms . . . that the economic prerequisites for the acceptance of the above named child [Erich] into . . . [the] . . . household are entirely adequate.

It is confirmed that . . . [he has] a net income of . . . Austrian Schillings per month which in accordance with conditions in Austria is above the average. This income will easily suffice for a family of five . . .

Further, the Youth Office hereby confirms to you its readiness to exercise guardinship [sic] oversight for the above named child, as soon as it will be in . . . [the] household. The Youth Office further would be prepared to make periodic inspections and to report the outcome to the competent authority in the United States.

In conclusion, it can be said the [sic] Erich would be assured of being properly cared for and educated as a member of . . . [the] family."

---

\* \* \* \* \* \*

"Mr. Roman . . . is presently employed as sales manager of the firm . . . he is married and has two daughters.

He resides in a very nice residential area, with much green open space. His apartment is furnished very comfortably and in good taste. The . . . family are known in their neighborhood as among the nicest and the warm manner of the . . . couple is everywhere appreciated. Mr. and Mrs. . . . have a harmonious marital relationship. The children . . . are well brought up, they attend the 4th and the 2nd grade of elementary school and are among the best students.

Mr. . . . after completing elementary school, attended six years at a college preparatory secondary school, then changed to a commercial school from which he graduated with success.

Mr. . . . is experienced in sales, both in employment and in self-employment, and now works with great success as sales manager. He has a monthly net income of . . . Austrian Schillings, an amount which, by Austrian living costs, is high.

He has stressed that he is not interested from any material motives in wishing to take the child; that he is perfectly

agreeable to having a third party administer the child's property.

.    .    .    .    .    .

So far as has been possible to ascertain here the prerequisites for this are amply present, there would be the certainty that Erich  .  .  .  would be treated and educated just as a child of their own."

Documentary evidence was also admitted showing that Roman and his wife are in good health and do not have a police record.

■   I find as a fact that Roman and his wife are qualified in every respect to care for and provide for Erich and I conclude from the evidence they will do so. This finding is based upon the evidence as a whole and, particularly, the demeanor of these petitioners. They convey impressions of great sincerity, strength, dignity. And this is remarkable when one considers that they do not speak English and, indeed, had never been to this Country until some ten days before the hearing. I conclude that in Erich's best interest, Roman and his wife should be appointed to be his personal guardians.

In applying the best interest test I have weighted heavily the need of Erich to be placed in a stable home where he will receive the love, affection and attention of a closely-knit family in the best position of providing these on a personal, fulltime basis. I have already indicated that the other petitioners are qualified for appointment but, on a best interest test, these petitioners are clearly superior. Given the traumatic experience which Erich has suffered in the loss of both parents, he needs guardians with a present capacity to care for him on a personal basis.

### F.

Appointment of Roman and his wife could be made with relative ease but for one most important factor: they reside in Austria and of necessity the child will live with them there. In making the appointment the Court recognizes that the child will remain an American citizen, cf. Afroyim v. Rusk, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), but there is certainly a chance that an American heritage will be lost. And that has been far and away the most troublesome aspect of the case.

■   There is nothing in our law, however, which precludes placement of a child with a non-citizen. Compare Irwin v. State Department of Public Welfare, Del. Orp., 125 A.2d 505 (1956). And under general law, my attention has not been called to any such bar. Cf. Annot., 15 A.L.R.2d 432. Indeed, placement abroad with both citizens and non-citizens has been found compatible with the best interests of a child. See In re Bullen, 28 Kan.Rep. 557 (2d Ed.) (1882); Wilson v. Mitchell, 48 Colo. 454, 111 P. 21 (1910); Commonwealth v. Gearhart, 178 Pa.Super. 245, 115 A.2d 395 (1955); Donnally v. Blankenstein, 167 Cal.App.2d 282, 334 P.2d 260 (1959); Miracle v. Miracle, 360 P.2d 712 (Okl., 1961).

I say frankly I am most reluctant to appoint a guardian under circumstances in which the child will grow up in a foreign country but, when all is said and done, I am not persuaded that this one single factor should, in this case, override all other considerations. And, unquestionably, they show that in Erich's best interest he should be placed with Roman and his wife.

### G.

Finally, I should say a word about religious alignment. See 66 A.L.R.2d 1410. Erich's parents were from different religious origins and there is little evidence to show that they were active practitioners of any faith at the time of their deaths. Gretchen and her husband are nominal

Protestants, while Martha comes from a Protestant background but now, with her husband, professes Reformed Judaism and permits Sarah to attend or not attend a Protestant church of Sarah's choice. Roman and his wife are practicing Catholics.

Dr. S. had abandoned active practice of Catholicism but the most recent statement of his views, as expressed by his wife to Mrs. H. just before the family left for Jamaica, shows that he would have wanted Erich to be raised in the faith of his own childhood, and a reasonable inference from the evidence is that his wife agreed.

In sum, there is no factual basis for a finding of consistent religious views or practice by either of Erich's parents nor can I discern any persuasive basis for making a judgment about what either parent wanted for Erich. I can only say that the appointment of Roman and his wife is consistent with testimony showing the last views of his parents on the subject.

\*　　\*　　.\*　　\*　　\*　　\*

The Court will appoint Roman and his wife guardians of the person of Erich. It is so ordered.

\*　　\*　　\*　　\*　　\*　　\*

On its own motion the Court stays execution of this order until 5 p. m. on May 10, 1973. The stay is made to give any party an opportunity to appeal the order entered herein to the Supreme Court. Any additional stay must be sought from that Court.

Although the stay entered herein expires on May 10, Dr. and Mrs. H. shall not deliver custody of the child until further order of this Court which will provide for assumption of responsibility for supervision of the guardianship by the appropriate Austrian agency.